LaSALLE NATIONAL BANK as Trustee under Trust No. 104048, Plaintiff–Appellant,

v.

GENERAL MILLS RESTAURANT GROUP, INC., Defendant–Appellee.

No. 87–2915.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1988.

Decided Aug. 23, 1988.

Anthony J. Pauletto, Skokie, Ill., for plaintiff-appellant.

Jeffrey L. Dorman, Sonnenschein Carlin Nath Rosenthal, Chicago, Ill., for defendant-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

LaSalle National Bank, trustee for a land trust that owns a building on Michigan Avenue in Chicago, appeals from the dismissal, on the defendant's motion for summary judgment, of LaSalle's diversity breach of contract suit.

The defendant, which owns the "Red Lobster" restaurant chain and which we shall call Red Lobster in an effort to enliven our opinion, wanted to open a restaurant on Michigan Avenue in Chicago; and on June 28, 1984, it signed an agreement with LaSalle to lease space in the land trust's building. The lease was to be in effect for ten years from the day that certain conditions precedent were satisfied; until that day, the lease would not be operative and no rent would accrue. Two provisions of the lease agreement are at the heart of this case:

[1] In the event the lease term has not commenced within one hundred eighty (180) days from the last signing or initialing of this Agreement, either party shall have the right to cancel this Agreement by written notice to the other party.

[2] In the event an application is pending before any governmental or municipal agency at the end of the above one hundred eighty (180) days, either party's right to cancel shall then be exercisable only at the end of an additional thirty (30) day period. Notwithstanding the foregoing, to the extent that either LANDLORD or Tenant is unable to complete in a timely fashion its obligations under this Agreement, the time period herein (the 180 or 30 days) shall be extended accordingly. For example, if LANDLORD or Tenant cannot complete its work within an applicable time period, needing an additional ten (10) days, then the one hundred eighty (180) day period shall be extended an additional ten (10) days.

Paragraph [2] was important because Red Lobster needed to obtain various government permits in order to convert the premises into a restaurant.

The initial 180–day period during which neither party could cancel the lease was due to expire on December 25, 1984. On December 7 Red Lobster wrote LaSalle (its actual dealings were with the beneficial owner of the premises and a real estate broker, but for the sake of simplicity we shall pretend that LaSalle was the landlord and the broker) that it was exercising its 30–day privilege of extension because the City of Chicago would not issue the necessary permits by December 25. On January 17, 1985, nine days before the 30–day extension period was due to expire, Red Lobster wrote LaSalle again. The permits hadn't come through yet (the parties have stipulated that the delays in obtaining the permits were not due to any lack of diligence by Red Lobster), and Red Lobster did not anticipate receiving all of them until April 30. The letter requested that the lease be modified to extend the noncancellation period to April 30 and stated that "although our General Counsel believes that under Paragraph [1] of our Lease Agreement Red Lobster would be entitled to whatever additional time was necessary to complete its work at no cost, in an effort to show good faith on our part, we are willing to pay $10,000.00 for the extension."

As LaSalle's lawyer admitted at his deposition, LaSalle believed that the agreement did extend the noncancellation period for as long as Red Lobster needed, but, as he said with charming candor, "We figured we had a sucker and we'd play him." LaSalle therefore replied to Red Lobster's offer of $10,000 for modification of the lease by demanding $20,000 by April 1 and $10,000

for each month thereafter until the permits were obtained. LaSalle mailed Red Lobster this counterproposal on January 25. Five days later, Red Lobster wrote LaSalle a letter notifying LaSalle that Red Lobster deemed the noncancellation period to have expired on January 26 (the expiration of the 30–day extension period) and was cancelling the lease. LaSalle countered with this lawsuit, in which it claims that the noncancellation period extended for as long as Red Lobster needed to obtain the permits and satisfy the other conditions precedent, and therefore Red Lobster broke the contract by cancelling it during that period. The district judge granted summary judgment for Red Lobster on the ground that the contract was ambiguous and the conduct of the parties showed that they had intended either of them to be allowed to cancel the lease after the expiration of the 30–day extension period.

■ If a judge can make sense of a written contract without hearing testimony, his duty is to construe the contract without letting the parties introduce any evidence other than the contract itself. See, e.g., *LaSalle National Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987) (interpreting Illinois law); *City of Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987) (same). But if he can't, then "extrinsic" evidence is admissible and the question of the meaning of the contract is treated as an ordinary factual question for decision at trial. See, e.g., *Ridenhour v. Mollman Publishing Co.*, 66 Ill.App.3d 1049, 1051, 23 Ill.Dec. 36, 37–38, 383 N.E. 2d 803, 804–05 (1978); *Nerone v. Boehler*, 34 Ill.App.3d 888, 891, 340 N.E.2d 534, 536–37 (1976). The district judge in this case used a hybrid method—deeming the contract ambiguous yet resolving the interpretive question on summary judgment, i.e., without a trial. This was a permissible course of action if no material facts were contested, but not otherwise. See, e.g., *City of Clinton v. Moffitt, supra*, 812 F.2d at 344; *Ridenhour v. Mollman Publishing Co., supra*, 66 Ill.App.3d at 1051, 23 Ill. Dec. at 38, 383 N.E.2d at 805.

LaSalle argues that material facts were in dispute and therefore there should have been a trial. Actually this is only its back-up submission, for its primary argument is that the lease unambiguously extended the noncancellation period for as long as it took Red Lobster to get the necessary permits. This is a possible but not inevitable reading. The last two sentences of the paragraph that we have labeled [2] support such an interpretation, but both the preceding sentence and paragraph [1] seem to contemplate that either party can cancel (without liability) after 210 days. Maybe as Red Lobster argues the references in the last two sentences to "complete ... its obligations" and "complete its work" refer to something other than a failure to obtain necessary permits. Or maybe if Red Lobster had gotten its permits but encountered some unexpected delays in completing the conversion of the premises LaSalle couldn't have yanked the rug from under it by cancelling the lease.

■ Although the contract is ambiguous, it could be read in the fashion urged by LaSalle and one might therefore think that the meaning of the contract could not be determined without a trial. Maybe so, but we think the evidence that was before the district judge when he ruled on Red Lobster's motion for summary judgment demonstrates conclusively that LaSalle is equitably estopped to enforce its interpretation of the contract. Estoppel was not the district judge's ground, but, to avoid the futility of a remand with only one possible outcome, we are free to affirm on any ground that is supported by the record and has not been waived by the appellee. *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937) (Brandeis, J.); *Martinez v. United Automobile Workers*, 772 F.2d 348, 351 (7th Cir.1985).

Faced with a tenant fearful that its landlord would cancel the lease at the end of the 210–day (extended) noncancellation period, LaSalle decided to exploit Red Lobster's fears by demanding a high price for a modification of the lease to extend the period. Implicit in the demand was a threat to cancel the lease if Red Lobster

refused to comply with the demand. Now one thing that is clear from the wording of the lease is that if one party can cancel, so can the other. LaSalle was taking the position that it could cancel the lease when the 210 days were up; this meant that Red Lobster could cancel it then too. So, faced by a stiff price for an extension, Red Lobster cancelled the lease. It could hardly have imagined that by doing so it was buying a lawsuit. LaSalle had as much as told it that if it didn't agree to pay $20,000 by April 1 (for an extension to April 30) LaSalle would cancel the lease; only such a threat could have been thought likely to induce Red Lobster to ante up substantial additional sums. The proposed lease amendment that LaSalle sent Red Lobster with its counterproposal of January 25 drove home the threat by stating that "the parties desire to amend the Lease to allow Tenant additional time to acquire all necessary permits," the implication being that without the amendment for which LaSalle was demanding $20,000 (for starters), Red Lobster would lose all of its rights under the lease, in which event LaSalle could cancel. There was also affidavit and deposition evidence that LaSalle repeatedly advised Red Lobster that it *would* cancel the lease unless Red Lobster agreed to pay the $20,000. LaSalle's deponents said they did not recall making any such statements, but they did not deny having made them.

LaSalle's statements conveyed an assurance that either party could cancel by January 26 unless the lease was amended. Red Lobster reasonably relied on LaSalle's representation—and very much to Red Lobster's detriment if by cancelling it broke the contract and laid itself open to this suit for damages. True, it is possible that Red Lobster may independently have agreed with LaSalle's purported though in fact insincere interpretation of the lease, and thus not have relied on it when it cancelled the lease. But LaSalle does not make this argument, and it is therefore waived.

■ "When a person apparently adopts a position which reasonably misleads someone into detrimental reliance, that person can be estopped from avoiding that position, regardless of the intent of his actions, if to hold otherwise would have an unjust effect." *Northern Trust Co. v. Oxford Speaker Co.*, 109 Ill.App.3d 433, 439, 65 Ill.Dec. 113, 117, 440 N.E.2d 968, 972 (1982); see also *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 933–34 (7th Cir.1988) (interpreting Illinois law); cf. *Whalen v. K–Mart Corp.*, 166 Ill.App.3d 339, 343, 116 Ill.Dec. 776, 519 N.E.2d 991, 994 (1988); *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213–14 (7th Cir.1979) (interpreting Illinois law). Much as in cases where equitable estoppel is invoked to prevent the defendant from pleading the statute of limitations, LaSalle's conduct in lulling Red Lobster into the belief that either party could cancel the lease estops LaSalle to argue the opposite position in court. See, e.g., *Beynon Building Corp. v. National Guardian Life Ins. Co.*, 118 Ill.App.3d 754, 763, 74 Ill.Dec. 216, 225, 455 N.E.2d 246, 252 (1983).

We realize that in Illinois the defense of equitable estoppel requires proof by clear and unequivocal evidence. See *Illinois Rockford Corp. v. Dickman*, 167 Ill.App.3d 113, 119, 117 Ill.Dec. 833, 836, 520 N.E.2d 1184, 1187 (1988). (We doubted this in *Combined Network, Inc. v. Equitable Life Assurance Soc'y*, 805 F.2d 1292, 1297 (7th Cir.1986), but *Dickman*, which cites an earlier decision that we had overlooked, *Slavis v. Slavis*, 12 Ill.App.3d 467, 474, 299 N.E.2d 413, 418 (1973), appears to lay that doubt to rest.) But in this case the uncontested evidence presented in the summary judgment proceeding leaves no room for doubting that LaSalle led its tenant to believe the lease could be cancelled by either party, and that the tenant, reasonably relying, cancelled. LaSalle will not be allowed to trap the tenant by arguing that the lease couldn't be cancelled after all.

Affirmed.